210-0086, the people of the state of Illinois, defendant Battelle Lee v. Charles Granter, defendant Schultz, argument of the defendant v. Douglas Jackson, argument of the defendant Lee v. Cousins of Spaulding. Thank you. Mr. Johnson. May it please the court, counsel. My name is Douglas Johnson and I represent the appellant Charles Granter. This case comes before this court after a bench trial out of Kane County where Mr. Granter was convicted of some charges and acquitted of others. There were two accusers in this predatory criminal sexual assault case. B.S., one minor, he was acquitted of aggravated criminal sexual abuse on behalf of her. The state admitted an insufficiency of evidence and one count was directed out, but he was found guilty of the predatory count. His finger into her vagina. As to T.W., he was acquitted on one count. The state directed out another and he was found guilty on a predatory, his sex organ into her vagina, and two aggravated criminal sexual abuse counts. We are asking that the remaining counts, the one remaining, as to B.S. and the three counts as to T.W. be reversed. We're asking because the evidence, I understand, is not normally this court's position to review what happened in the court down below and make credibility determinations and those things, but the evidence here is so insufficient, there is a reasonable doubt at each and every one of the convictions. I submit to you in this case, it is the rare case where the defendant has been able to prove his innocence, certainly with regard to T.W. He has done it by medical objective evidence. I'd like to review and point out four things about T.W. And part of it, I think a reading of the state's brief in trying to explain the shortcomings in the evidence illustrates how he is innocent of doing anything wrong to T.W. First, Charles Brancher did not have a sexually transmitted disease. He did not have an STD. There is no dispute about that. T.W. had an STD. I submit to this court the only logical, reasonable inference is that when she was examined on May 16th of 2007, she had an STD. This is a 13-year-old girl or so. Now, in the state of Michigan... I thought the test was deemed inconclusive. Am I correct or incorrect? The trial judge deemed the evidence inconclusive. I thought the expert said that it was inconclusive. If you read the evidence, if you read closely Dr. Link's testimony, Sterrit's, and put them all together, I submit to you the only logical inference is that this child had an STD. I thought the expert said something to the effect that the only time one can determine whether or not the virus is present is if there is a positive result. If there is a negative result, it doesn't necessarily mean that it's there or it's not there. It just means you didn't have sufficient evidence of its existence. I submit to you that the evidence from the record is not as clear as Your Honor is stating it. Okay. Tell me what you think it said. I would agree with what the state writes in their brief where they write that the evidence, quote, suggested the strong possibility of the presence of HPV. I think they are conceding that if you look at this, this child had this disease. And for the state to say that, well, she couldn't relax during the examination, so we really don't know. We're talking about a man who is serving life in prison. Couldn't they have brought the child back and when she could relax, find out the answer? Because the answer lies there. Because if she indeed had this sexually transmitted disease, he is not guilty because the evidence was undisputed that if she has this disease, then it is super contagious and any contact with her vagina, her sex organ, is going to cause anyone who touches her to have it. On what date did she contract the disease? It is unknown. But how do we know that these acts occurred after? All right. Well, the indictment charged, as to TW, a course of sexual abuse over a two-year period until April 29th of 2007. The testimony of Pam Ely was that TW said to her that during the month of April 2007, he touched me, my vagina, with his hand and his private part, and it happened lots of times. So the indictment and the evidence suggest that this abuse, for the last time, happened in April of 2007. So to... I'm sorry, by the answer to that question, that it happened lots of times? It happened lots of times. Before 4-29-07? Yes, Your Honor. So it happened lots of times prior to April 29th or April of 2007. So then, if we know on April, I'm sorry, May 16th of 2007, the State has put this in their brief. They are arguing she could have contracted, I believe the term is, it is possible she contracted this disease after Charles Granter abused her for the last time in April of 2007 and before her exam on May 16th of 2007. That is an unreasonable interpretation. That is speculative. This child is 11 to 13. There is no evidence that that happened. And the only thing the State sets forth is, well, she lived with her stepbrother or there were other men around her household. Now, the State gets that from the defendant who testified and basically pleaded, I don't know what happened to this girl. It wasn't me, and it maybe was those people. I think for the defendants, say it, in pleading for his life or for his freedom, and the State is very different, this Court should not figure, oh, well, she contracted it later. That is unreasonable, and I think that is one key point that makes this Court, makes this case the correct case for this Court to say, you know, in this very rare circumstance, the evidence is unreasonable and it is unsatisfactory, certainly as to T.W. Now, another point. T.W. said, and I believe this is crucial, she said he has brown spots on his penis. Now, this is a girl who is alleged, and I mean no disrespect to these children, but this is a girl who is alleged for two years he touched me with his penis on my, in my vagina. He made me touch him on his penis. She admits I saw his penis. And then she says he had brown spots, so of course he went to the police station and he did the humiliating act of being photographed. Detective Jones was there, and there is no dispute, there are no brown spots. Lucky for Charles Grant, or you can call it luck, because if he had any brown spot, I couldn't stand, I would have a real hard time standing before your honors today. He didn't have any brown spots. She saw it. How can this be true? Well, the state says, she testified they were tiny. Okay, they were tiny, but she said she saw them and he didn't have them. That's two points that he has proven his innocence on. This is medical evidence. Three, she was impeached. It wasn't technically proven up, but at the beginning of the cross-examination, defense counsel said, did you talk to the prosecutors before this trial and tell them that Mr. Granter did not touch you inside your private part with his hand? That's a pretty key point in this case to which she said, I don't remember if I did or not. Now, the prosecutors weren't put on the stand to determine, to figure out what happened here. But I submit to you, she said, I don't remember. If it was true, shouldn't she have said, no, I didn't say that. I never would have said that. That's strike three. And finally, strike four, the photographs. Again, I would have a real hard time standing before your honors right now if, I don't think I would be, if photographs of these children in compromising positions were found. They said, Mr. Granter made us spread our legs, made us do these things. And then he took photographs with his Polaroid camera on us. So then, in a surprise search, and I'll get to why it's a surprise search in a second and why we know it's a surprise search. But Mr. Grant, the police come and they search into a long five and a half hours, I believe, search of his home. And they turn it upside down, as you would figure, as they have every right to do, I suppose. And they find not a single photograph of these children that is in any way compromising. So where is that corroboration? Where are those photographs? One question might be, well, he hid them. First, as I said, I don't believe there's any evidence that it wasn't a surprise search. But let's just suppose, well, he hid them, he got rid of them. We know that's not true because he had some embarrassing photographs in his home. They were of an adult woman, but quite frankly, I looked at them and they're embarrassing. Human nature would be, if you're going through your home, you know the police are coming, you've got to get rid of things, you're going to get rid of these photos. There is nothing illegal about them, but it still doesn't make any sense that a man who is going to ditch the other pictures is going to keep these so that the police can find them. And what does the state say? Well, they just didn't find them. Again, look at the things that they are saying. The examination wasn't complete. She contracted the disease in the 30 days after the evidence and indictment said he abused her. The brown spots were small. The police didn't find the photographs. I submit to you, this is that rare case where the evidence was unsatisfactory with regard to TW. And no, she didn't, there are many other things, I know they don't have to prove it, but TW did not come forward. I know she doesn't have to, but she did not come forward. They sought her out. And Pam Ely, one more point with regard to the photographs in TW, Pam Ely at a pretrial hearing suggested that a compromising picture of TW was found. There was a photograph of TW and her legs were in the air. Please take a look at that picture, it's in the record. That is a child that is, there is absolutely nothing inappropriate. Why does it matter? Because Pam Ely, if I'm pronouncing that name right, is a very crucial player in this. She got the ball started. And she also admitted with regard to TW, I asked her when things started, I asked her, do you have any problems with Charles Granter? That's not how it's supposed to be done. That is a terrible way, and I think she would admit it, to start. That's a mistake. You don't start a child interview, I think we all know that, with such suggestion. Unfortunately, as we also know, these interviews were not taped back then, they are now. That's true, they don't have to, didn't have to tape them then, there's no violation of the law, but they were not taped, so all we know is a little we can garnish. But I believe that's why things got to where they are. Charles Granter has done everything he can. These arguments regarding inconsistencies in the evidence and things of that nature, which one of these arguments that you're making now was not made to the trial court? I believe that, I believe that very similar arguments were made to the trial court. I mean, the trial court is charged with the duty of ferreting out the inconsistencies of testimony and making a determination. The trial court is the one who looks these people in the eye when they testify. You know, as you've indicated, the record has to be, the cold record has to be pretty overwhelming for us to say the trial court was wrong in its determination of credibility or consistency of witnesses. I understand that, and if the standard weren't so high, I believe this would be a dunk shot. But it isn't because the standard is high, but it has been met here. The trial court, for whatever reason, got it wrong. It might be the problem inherent in child sex cases, because there are statements, eloquent statements, that I won't state as eloquently right now. The fact is, once you are accused, you are in big trouble. You better have an airline ticket showing you were an albuquerque, or you better have some way, because if it's going to be child against adult, the child is going to win every single time. And this is a very dangerous area of law, because if this man, who has shown you medical evidence that it could not have happened the way she said, cannot get a reversal. I don't know why the trial court got it wrong, but my position is they absolutely got it wrong. The trial court is human. The trial court, when it rendered its judgment, said that testimony of the child to a third party, and it was Pam Neely, was corroborative of the evidence. Do you understand what he meant by that? I believe it wasn't corroborative. I understand, yeah, I understand the term corroborative. Okay. Would a prior consistent statement be corroborative? I believe it would be. I also believe there are serious issues, as I've laid out, with regard to Pam Neely. She is the person who started the interview by saying, do you have any problems with Charles Granter? She is the person that said a picture was compromising and bad. When you can look at the picture, and I submit, Your Honor, you will not find anything wrong with that picture. What was the evidence? I know there's some evidence that these two girls knew each other from church or something. Was there any evidence produced or induced in trial to show that they talked to each other, that they talked to each other about the defendant or anything of that nature? Nothing as direct as I'd like to be able to tell you, just that they knew each other. So you have a trial judge who hears evidence that these two girls knew each other, but not necessarily that they were friends or that they talked to each other, that they go to each other's house, things of that nature. They just knew each other. And they're bringing forth, and I know there are certainly inconsistencies between the two stories, but you have two children who are telling arguably similar things are happening to them, two girls about the same age, met the defendant about the same way. Does that play into the trial court's determination here at all as to the credibility of the two witnesses? We don't just have one with all these inconsistencies. We have two. I believe the State is arguing what Your Honor is suggesting and asking about, and the answer to that is no. These are very different allegations. With regard to T.W., this is, pardon my language, penis into vagina contact repeatedly. It happened, quote, lots of times. This is he made me put my hands on his penis. This is he touched me on the lips or he kissed me. These are a long course of repeated intercourse and penis-vagina contact. B.S. says on March 16th of 2007, he put his hand, well, she says it a couple of different ways, but getting right to it, she says he put his hand down my pants and touched my vagina. Five pages later, she says he put his hand up my skirt and touched my vagina. When was the outcry, though? The outcry by B.S. shortly before the charges came in the note to her sister, or the note regarding Rebecca. So about a month. Yes, but the point is very, very different. And the other crucial point is I went back and looked and thought, well, is there a difference here because are they going to ask me, well, he maybe didn't know B.S. long enough. Maybe he was grueling her. Maybe he was waiting on her. That isn't what happened. He'd known B.S. for three years. How can those be similar? If child sex offenders, I believe, act the same way, there's no modus operandi here. They cite the Taylor case and say these are so similar that they corroborate each other. And I submit to you the Taylor case is premised on the proposition that the acts, at least one of the acts, against both victims is very, very similar. That isn't the case here. T.W. is a whole different ballgame than B.S. And T.W., because she's been disproved by the brown spots, by the STD, by the impeachment, and both of them are disproved by the photographs, they can't corroborate each other. Basically what they say is for whatever reason, this story is made up. And I know that, and I don't know if your honors, but maybe laypeople and others think this has to be true. Why would the child make it up? But we know children make it up. And the fact and what makes the system work is the truth doesn't change. And these children were inconsistent. I know I can sit here and argue, well, the timeline wasn't right. Well, they didn't have the photos. And I can be asked, well, they don't have to have all that. The child said it happened, but she missed it over and over again. There is nothing. This is more than inconsistency. And he is, I don't know what else he could do to prove his innocence. Did the nude pictures of the wife, the admission of those pictures, what effect did they have on the bench? Because we defer to the judge and understand that he can decide what's right and what's wrong or what's relevant, what's not relevant, he stated that he did not consider those. And I don't believe those were admitted. I bring those up only to show that he was, Mr. Granger was indeed surprised by the search and had no knowledge that it was coming because any human being would have hid those pictures. Maybe I'm more easily offended than others, but I believe any human being would have taken those two pictures. They aren't terrible, but they aren't something that if you were the subject of a sex investigation, those are about exhibits A and B that are going out of your house. So for all those reasons, I am asking this court to take a step that it does not usually take and deem the evidence insufficient as to both of the children. They don't corroborate each other and vacate all the convictions against Charles Granger. Is there no further questions? No. Thank you. Thank you. Ms. Augsburger. Good morning, Your Honors. May it please the court. My name is Constance Augsburger. I'm here today for the appellate prosecutor's office, second district, representing the people of the state of Illinois in this matter. And Mr. Johnson does point out two unfortunate and inartful statements that are in our brief. And I may as well just address those right from the start. On page 10, our brief says that at the bottom of page 10, defendant relies on the medical evidence presented at trial from TW's vaginal examination, which suggested a strong possibility of the presence of the human papillomavirus. That is inartful in that that is not what the record shows. The record shows that the child had what the doctor, the medical expert, deemed a varicose lesion, and he was unable to state with any certainty what caused it, and he was unable to rule out any causes. As Justice McLaren pointed out, the trial court questioned Dr. Link at length at the close of his testimony to make sure that the trial judge understood what the expert was saying. Are you saying maybe it was and maybe it wasn't? Did I get that right? And Dr. Link said, yes, you got that right. The doctor didn't stand up there and say, I think it probably was or I think it probably wasn't. He said, I can't state. It's inconclusive. And he was actually the expert for the prosecution. He didn't lean in favor of the prosecution. He was quite honest and said, I performed this examination and I performed this test. And he said two things. Number one, the test, a brushing test of the vaginal area of the child, was negative for human papillomavirus, but he acknowledged that a brushing test sometimes is a false negative. So even the negative test didn't rule it out, but it didn't prove it either, and he was unaware of any other tests that were performed on the child, and even though he was pressed, he could not state with any certainty at all what did or did not cause the lesion. The other thing that he said was his examination of the child neither ruled out nor ruled in sexual abuse of her body. What about the brown spots issue? The brown spots, the trial court did acknowledge those in its summing up and said issues were, I'm looking in the summing up of the trial court on July 29, 2009. The record's rather confusingly numbered, but this appears in S268. This is the trial judge. Issues were raised regarding genital warts or spots on the penis of defendant. Regarding TW's description, there was no detail given at the trial except on cross-examination where the questions were asked. The question was asked about the spots. She said they were small, and further description was invited. They were tiny and small and that she had never seen a penis before, and that's from TW's testimony that was given on March 31, 2009 at page S173. The trial court goes on to say, so the court was unable then to match up medical testimony as to the exclusion of or likelihood of the event taking place based on the medical observations of the defendant and his penis and the tests run versus what TW was referring to, especially without further detail. The trial judge thus acknowledged at length the equivocal and ambiguous nature of these two pieces of evidence. The trial court faced them head on, said it is a little confusing. The trial judge made a ruling even in the face of ambiguous information. The trial judge didn't say it's ambiguous. What's ambiguous about the brown spots? That they were tiny and small and she had never seen a penis before and there was no further description. Let's take them one at a time. The fact that she didn't see a penis before, what relevance or materiality does that have? Well, I don't know. I'm looking at the backs of my hands and I see one or two little brown spots on the backs of my hands. But you've seen the back of your hand before. Well, and I could show it to you and you could see a little brown spot. Mr. Johnson characterizes the evidence as though TW had had many, many, many opportunities to carefully examine the defendant's sex organ and that the brown spots were huge moles. I'm having a problem with the concept that if she sees brown spots, whether they're small or large or a few or many, and they're not there, then that suggests that she's not being accurate in her observations. That's a possibility that she wasn't entirely. No, that's not a possibility. That's an irreconcilability. Her testimony and the facts, the scientific facts or the photographic facts, the real evidence, the demonstrative evidence indicates that she was wrong. Now, what the trial court did with her inconsistencies, her irreconcilabilities, her inability to observe is one thing. But to say that this is confusing, I don't think it's confusing. And I don't think that the fact that she hadn't seen a penis before doesn't really mean anything one way or the other insofar as whether it makes it less or more confusing. Well, I don't want to indulge in rank speculation, but she was a little girl, and even to big girls, a male sex organ can be a scary and intimidating sight. I don't know what the defendant's sex organ looked like, and I'm glad that I don't. I'm not interested. Well, how old was she when she testified? Thirteen, I believe. And I think she was 11 when this happened? I believe that's correct, Your Honor. The trial court in its ruling or its findings said that these prior consistent statements made to a third party were corroborative of the testimony. Do you understand that that is what the law is relative to prior consistent statements? I don't really. I have to confess to Your Honor. I didn't give a lot of thought to it because this was not an issue that was discussed at length in the trial court. I will offer to the court this thought. In the very short amount of time that I had to review the record, and I reviewed it from top to bottom, I read every document in the common law record and every page in the record of proceedings, and I would offer to the court that this is a model of care and precision on a trial court's part. Mr. Johnson pointed out that child sex abuse cases are very difficult because the witnesses are young. It's difficult for them to testify with accuracy and precision, and it's difficult to assess how well their memories hold up over time and whether they know what they're looking at or what they experienced and so on. And he expressed a great deal of fear that somebody like Mr. Granter could be sent to prison for a very long time because of the, I think he was arguing, the inherent unreliability of child witnesses. I'm not sure that child witnesses are inherently unreliable, but in this particular case, the 11510 hearing that went on for days and days gave the trial court and the people and the representatives of the defendant a great deal of time to weigh very carefully, step by step, through the entire statements that all of the witnesses gave. Pam Ely was on the stand at length and reviewed her notes at length. The mothers were on the stand. The other investigator was on the stand, and at the close of the 11510 motion, the court said, I will continue to consider these things, and the court weighed everything very carefully. Getting to the point, if there were brown spots on his penis, I think it would be appropriate to say that that would corroborate her testimony or her allegations of sexual abuse. If, in fact, the defendant had papillomavirus and had warts on his penis, and it was established that she may or may not have had it, that that would tend to corroborate her statements. What corroborates her testimony, other than her own testimony, that there was criminal sexual abuse in this particular instance? Well, she described situations occurring between herself and the defendant, which were markedly similar, though not identical, to the experiences of the other child witness. And as Justice Burke pointed out, there are a number of consistencies between the stories presented by both child witnesses to Pam Ely, when she took their statements, and also when the individual children later testified at trial. They did offer their statements twice, once to Pam Ely and once at trial. They both came to know the defendant through church. They both were given presents by the defendant. They both spent some time alone with the defendant at his house. The defendant bought them clothing and took them on one or more shopping trips. Let's talk about the inconsistencies, though, because, I mean, the allegations made by TW are certainly much more extensive than made by BS. Counsel has argued that the defendant knew BS basically as long as he knew TW, but didn't engage in this activity until, according to BS. Well, it's not completely certain that the defendant knew BS quite as long as he knew TW, and it is very clear from the record TW lived in the neighborhood and was able to walk to the defendant's house quite easily and spend a fair amount of time there. Defendant's alibi witness, Mr. Varnas, said on more than one occasion when he went to defendant's house to have coffee with him, TW was there and was leaving as he arrived. Wasn't supposedly the defendant TW's godfather? I believe that's correct, Your Honor. I believe that Lucinda, TW's mother, did have the defendant listed as TW's godfather. And continuing in that same line, child sexual abuse certainly is a crime of opportunity, and I would submit to the court that the record demonstrates the defendant's opportunities to be alone with TW vastly outnumbered his opportunities to be alone with BS. BS came from a big family, and defendant and his wife took BS and her other siblings on shopping trips together. That certainly is not a golden opportunity to abuse anyone. Ms. Sealy said that she interviewed TW at TW's house. Is that correct? I believe that is correct, Your Honor. And she said, I think, that it was done that way because there were some problems making contact with TW to set up an appointment for an interview. I believe TW, the impression that I received from the record, Your Honor, and this is simply my impression, that TW's family was an unusual, possibly broken family that was very economically distressed. It wasn't clear that TW's family had an automobile. So why they couldn't manage to have a statement at the usual location at the investigative center in Kane County, it's not totally clear. What does appear to be the case from the record is Ms. Sealy's office discovered TW because of one of the photographs discovered at defendant's home. And I think Ms. Sealy's description or characterization of the photograph is kind of beside the point. It is just an ordinary photograph. I agree. But it did alert the investigative team to defendant's knowledge of another child of approximately the same age. And I could, I do believe that the photograph of TW was shown to BS's family, and BS's mother identified her as a little girl they knew from church on Wednesday nights. Because as Justice Burke points out, the two children were acquainted with each other. They were occasionally apparently in the same Wednesday night Sunday school, Wednesday night church class. There's no evidence, though, that they were chums or pals. They didn't go to the same school. They were of different socioeconomic backgrounds, it is apparent. And they lived in very different neighborhoods. So there's no indication that Ms. Sealy asked a leading question of TW as to whether or not she had any problems with Mr. Granter. Why did she prime the pump, so to speak? Why did she? I have no idea, Your Honor. Did she explain it on cross-examination? I have to confess, Your Honor, I don't have a note as to that particular. Did she explain that she had a photograph of TW and that's the reason why she was there questioning TW? Did she show the photograph to TW and ask her? She may have. I know that there were photographs of B.S.'s family playing board games at the defendant's house, and those photographs were shown to Ashley, B.S.'s oldest sister. And Ashley identified them, yes, that's me, that's my brother, we're playing sorry or we're playing clue or whatever, and yes, we're at defendant's house. And it is possible that Ms. Sealy may have shown a photograph or two to TW. But as Mr. Johnson points out, the one picture of TW and the pictures of the S. family are just ordinary photographs. And if we might address the photographs for a moment, Your Honor, Mr. Johnson is very concerned that the photographs were never found. Both TW and B.S. consistently testified that the defendant took Polaroid photographs, and they didn't say Polaroid, they said he had a black camera and the picture came out and it became a picture. The rest of us would know that's Polaroid. And that he said to both of them, a variation on, I'm going to put these away where no one can find them. So I suggest to the court it's not surprising that they were found. And when Mr. Granter's property was searched, at his testimony, he did note there were several cars and trucks on his property, none of them were searched. His property had four sheds with padlocks on their handles. Mr. Jones, one of the investigators, stuck his head into one of them and walked away, and the other three sheds weren't searched at all. So there were lots of places the photographs could have been, and defendants said he was going to put them where they couldn't be found. The photographs of the nude female that are in the record, I believe Justice Bowman has it correct, I believe those are most likely photographs of the defendant's wife. She apparently willingly posed for them. Perhaps she's proud of them and the defendant was happy to take them. He didn't hide them because she knew they existed. Any other questions? Are there any other questions? I do wish to note for the court that Pam Neely's testimony concerning the penile penetration of TW, which appears on S204 and S205, TW told her defendant touched her inside part, quote, lots of times. And this is a quote from Pam Neely. She described two different things. She described him touching her private part with his hand, and then on one occasion, he had touched her with what she called his stuff. That's the end of the quote. Ms. Neely goes on to say that TW told her the defendant tried to put his stuff inside of her but stopped. So there really isn't any evidence in the record that TW and the defendant engaged in full-blown sexual intercourse ever. There isn't evidence that he attempted to have intercourse with her on one occasion. Thank you. Thank you, Your Honors. Mr. Johnson. Briefly, Mr. Granter was convicted of predatory criminal sexual assault based on his penis being in and on her vagina, in her vagina. So, therefore, there was testimony of that. As with regard to the pictures. Wait a second. You're saying that there was evidence of that, and she, Ms. Augsburger, said there wasn't. I'm saying that he was found guilty of that. I don't believe it was proof beyond a reasonable doubt. She seems to be saying that there wasn't, that his penis never touched her vagina. That is what he was convicted of. So I would take that to suggest, yes, we agree. If you look at the evidence appropriately, his penis never did touch her vagina. Is that the statement that it happened just the one time, though? Could it be read that it happened just the one time between penis and vagina? No, I believe that. I know there's another statement that says it happened lots of times. Yes. When we say it happened lots of times, what are we talking about? That activity? Yes. Penis into vagina is what TW said. It seems actually somewhat inconsistent. There is no legally inconsistent argument between count one and count two, but it seems very inconsistent to find him guilty of the penis in or on vagina and not guilty of the hand in her vagina. I submit to you that shows the insufficiency in the evidence. The two not guilty findings were finger in vagina for both. I'm sorry. It was finger in vagina for TW and hand on breast for BS? Hand on breast for BS, yes, was not guilty, and there was a predatory account for TW that was not guilty, and that was hand into vagina, even though there were statements that suggested that Ely related. I thought the judge indicated that the reason, at least my understanding, the reason for the not guilty finding was because that statement wasn't made to Ely, that the victims made those statements in court but did not make them to Ely, and that's why the court found him not guilty of those. That is what the court said in the ruling. Okay. With regard to the pictures, the evidence did not show those are pictures of the defendant's wife. It escapes me now who that is. It was not pictures of the defendant's wife that they would have any reason to keep. The statement that counsel calls inartfully drafted in their brief, I submit to you was an honest and appropriate assessment of the evidence, and that is why it is not so clear that this child, that the expert could not say whether or not this child had an STD. The reason I argue that it is clear that it is the only reasonable inference is the same reason that sentence was written, because if you look at this testimony, which I had to read 1,000 times. Are you serious? You really read it 1,000 times? I apologize, Your Honor. I repeatedly read it. You wouldn't have to read it that much. But the only inference is that this child had an STD. The brown spots, I won't reiterate anything except to say not only do the brown spots failure to corroborate TW, they destroy her credibility. The case could begin and end there. With regard to how long B.S. knew Mr. Grancher, I submit to you the evidence is very clear. On page volume I, page 96, she stated that her family was friends with defendant's family ever since they started attending church together when she was 6 or 7. She was 11 at the time this allegedly happened. She was 13 when she testified. It makes no sense that Mr. Grancher would do what TW said she did to her, he did to her, and that B.S. would only be touched once. These are not similar crimes, and that's why they don't corroborate each other. Mr. Grancher did not work outside the home. His wife worked a 9 to 5 job or an 8.30 to 4.30 job. She was always gone. And this was a relationship where a man and a woman who had no children took these families in because they wanted to be friends with them, and it went bad. And your argument is for an outright reversal on all charges related to B.S. Every single charge, absolutely I believe the evidence was sufficient, but certainly hope that each charge is looked at separately and as a less desired alternative that some of them are reversed. Thank you, Your Honor. Thank you. The case will be taken under advisement. It will be a recess lunch, and I think the next case will be at 7 o'clock.